IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CASSANDRA L. WYERS                                                                          PLAINTIFF

    v.                Civil No. 2:21-cv-02031-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,[1]
Social Security Administration                                                              DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Cassandra L. Wyers, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.    Procedural Background**

Plaintiff filed her application for benefits on October 25, 2018, alleging disability beginning August 17, 2018, due to neuropathy, diabetes, high blood pressure, and knee problems. (ECF No. 12-2, p. 12; ECF No. 12-6, p. 3). Plaintiff was 36 years old on the alleged disability date, has a limited education, and is unable to perform any past relevant work. (ECF No. 12-2, p. 27-28). The Commissioner denied her applications initially and on reconsideration. (*Id*., p. 12). At the Plaintiff's request, an Administrative Law Judge ("ALJ") held an administrative hearing on April 21, 2020, via telephone due to the extraordinary circumstance presented by the COVID-19

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

pandemic. (ECF No. 12-2, pp. 12, 34-57). Plaintiff was present and represented by counsel. (*Id*., pp. 12, 35).

On June 30, 2020, the ALJ concluded that Plaintiff's disorder of the right knee, disorder of the back, morbid obesity, hypertension, and diabetes mellitus with neuropathy were severe, but then concluded they did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (ECF No. 12-2, pp. 14-19). He found Plaintiff capable of performing less than the full range of sedentary work, with occasional climbing of ramps and stairs; never climbing of ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, or crawling; and avoiding even moderate exposure to hazards such as dangerous machinery, unprotected heights, operating automobiles, or carrying firearms. (*Id*., pp. 18-27). With the assistance of a vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work as a document preparer, printed circuit board inspector, and cutter and paster. (*Id*., pp. 28-29). Plaintiff was found not to be under a disability from her alleged onset date through the date of the ALJ's decision. (*Id*., p. 29).

The Appeals Council denied Plaintiff's request for review on November 25, 2020. (ECF No. 12-2, pp. 2-4). Plaintiff then filed this action. (ECF No. 1). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs (ECF Nos. 15, 16), and the case is ready for decision.

## II.   Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154

(2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). The fact finder only

considers a plaintiff's age, education, and work experience in the light of her residual functional capacity if the final stage of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

### III. Discussion

Plaintiff raises five issues on appeal: (1) whether the ALJ erred in failing to adjudicate a closed period from the alleged onset date, August 17, 2018, through recovery from the right total knee arthroplasty on October 15, 2019; (2) whether the ALJ fully and fairly developed the record; (3) whether the ALJ erred at Step Two; (4) whether the ALJ properly evaluated Plaintiff's subjective complaints and applied the *Polaski* factors; and (5), whether the ALJ erred in his RFC determination. After thoroughly reviewing the record, the undersigned finds that the ALJ failed to develop the record fully and fairly, and therefore, it does not provide substantial evidence to support the Commissioner's decision to deny benefits in this case. Because this failure necessitates reversal and remand, it is not necessary for the undersigned to address Plaintiff's remaining arguments.

### A. Closed Period Evaluation

In her first issue, Plaintiff contends that the ALJ failed to adjudicate a closed period from the alleged onset date, August 17, 2018, through recovery from the right total knee arthroplasty on October 15, 2019. (ECF No. 15, pp. 8-10). Plaintiff anticipated that the ALJ would either disagree with the alleged onset date or choose a closed period to evaluate, applying the medical improvement standard. (*Id.* at 8). As the ALJ did neither of those things, Plaintiff insists legal error was committed. (*Id.*). While Plaintiff uses the term "medical improvement," this case is not an "action relating to medical improvement" within the meaning of the Social Security Disability Benefits Reform Act, 42 U.S.C.A. § 423. *See Camp v. Heckler*, 780 F.2d 721 (8th Cir. 1986). Medical improvement is assessed from the last favorable decision to determine whether

4

improvement has occurred since the Commissioner last found Plaintiff disabled. That is not the case here. Plaintiff did not allege a closed period of disability in her statements to the Agency. Plaintiff appears to allege that it is the ALJ's duty to consider the closed period potential of a case; however, she provides no support for this argument.

The Commissioner may award Social Security disability benefits for a closed period if a once disabling condition later ceases to be disabling. *Harris v. Sec'y of Dept. of Health & Human Servs.*, 959 F.2d 723, 724 (8th Cir. 1992) ("[A] claimant who is not entitled to continuing benefits may well be eligible to receive benefits for a specific period of time."). A disabling condition qualifies for a closed period of disability if it lasts for at least twelve months. 42 U.S.C. § 423(d)(1)(A); *Karlix v. Barnhart*, 457 F.3d 742, 747 (8th Cir. 2006). A claimant may be eligible for disability benefits for a closed period if the evidence presented shows the claimant was unable to work for at least twelve months but recovered the ability to work before the decision on her claim is made. *Sarah B v. Saul*, 2020 WL 3172466, Case No. 4:19 CV 1761 (E.D. Mo. June 15, 2020).

Here, the ALJ denied Plaintiff's claim based on his determination that Plaintiff has the RFC to perform work, not because the duration of Plaintiff's alleged disability did not meet the 12-month requirement. As the ALJ found Plaintiff not to be disabled at any time during the relevant period, he was not required to consider a closed period of disability or present a rationale for not awarding a closed period of disability. Accordingly, we find that the ALJ did not err by failing to consider a closed period of disability in this case.

> **B.      Development of the Record**

Plaintiff contends that the ALJ failed to develop the record fully and fairly because he did not order mental and physical consultative examinations. (ECF No. 15, pp. 10-14). "Well-settled

precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Vossen*, 612 F.3d at 1016 (quoting *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)). "Failing to develop the record is reversible error when it does not contain enough evidence to determine the impact of a claimant's impairment on [her] ability to work." *Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017) (citing *Byes v. Astrue*, 687 F.3d 913, 915-16 (8th Cir. 2012)).

Residual functional capacity ("RFC") is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller v. Colvin*, 784 F.3d 472, 479 (8th Cir. 2015) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

The ALJ "bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). The ALJ should obtain evidence that addresses the claimant's "ability to function in the workplace." *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). The opinion of a non-examining physician, standing alone, does not constitute substantial evidence in the record in the face of a conflicting assessment of a treating physician. *Jenkins v. Apfel*, 196 F.3d

922, 925 (8th Cir. 1999). An ALJ may conduct an independent review of the medical evidence and other evidence, such as motivation to return to work and daily activities, along with the non-examining physician's opinion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002). An ALJ must not, however, substitute his opinions for those of a physician. *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008). In other words, an ALJ is not permitted to "play doctor." *Pates-Fires v. Astrue*, 564 F.3d 935, 946-47 (8th Cir. 2009).

While an "ALJ may consider all evidence of record, including medical records and opinions dated prior to the alleged onset date, when there is no evidence of deterioration or progression of symptoms," it is improper for an ALJ to rely on an opinion rendered, which given its timing, could not consider the subsequent medical records indicating a worsening of [a claimant's] symptoms and functionality. *LaFrance v. Astrue*, No. 09-403, 2010 WL 624202, at *14 (D. Minn. Feb. 22, 2010) (citing *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir. 2010) (opinions of non-examining sources are generally entitled to less weight than examining sources, especially when those opinions do not consider all the pertinent evidence in the record). An ALJ errs in relying on his own inferences as to the relevance of notations in the medical record when determining a claimant's ability to function in the workplace. *See Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017) (remanding for further inquiry as to the relevance of "no acute distress" and "normal movement of all extremities" with respect to the plaintiff's ability to function in the workplace).

The evidence in this case indicates the ALJ determined Plaintiff's RFC without a medical opinion to support his assessment of the latter part of the treatment record showing a worsening condition. In setting out Plaintiff's RFC, the ALJ relied on the March 2019 and May 2019 assessments provided by non-examining state agency medical consultants, Jim Takach, M.D. and

7

Kristin Jarrard, M.D., respectively. (ECF No. 12-2, pp. 25-26; ECF No. 12-3, pp. 10-12, 24-26). Dr. Takach initially reviewed medical evidence from June 2018 to February 2019 and assessed that Plaintiff would be capable of sedentary work with occasional postural and hazard restrictions by August 16, 2019, twelve months following the alleged onset date. (ECF No. 12-2, p. 25; ECF No. 12-3, pp. 7-12). Several months later, Dr. Jarrard reviewed the initial medical evidence as well as additional evidence showing orthopedic treatment for distal femoral medial osteochondral defect with brace recommended. (ECF No. 12-2, p. 25; ECF No. 12-3, pp. 24-26). Dr. Jarrard affirmed Dr. Takach's assessment. (*Id.* at 26). The ALJ found the state agency consultants' physical RFC assessments to be persuasive, noting that they were consistent with and supported by objective findings in the medical evidence of record. (ECF No. 12-2, p. 25). While the agency consultants reviewed medical evidence from June 2018 to May 2019, part of the medical record occurs outside of the state agency consultants' scope of review, including records indicating a worsening condition.

Plaintiff's treating physician, orthopedic surgical specialist Timothy J. Garlow, M.D., who performed Plaintiff's right total knee arthroplasty (ECF No. 12-10, p. 29), provided an opinion regarding Plaintiff's ability to function in the workplace in January 2020. (ECF No. 12-8, p. 119). Dr. Garlow opined that Plaintiff could stand or walk for a total of 2 hours but sit for a total of 8 hours in a workday. She could sit continuously for one hour and required at least three work or bathroom breaks. She did not need to elevate her lower extremities but must lie in a supine position for at least 1 hour due to back pain. Dr. Garlow opined that Plaintiff could climb, squat, kneel, crouch, bend, or stoop for less than two hours but could balance for two hours. She was also to limit exposure to extreme temperatures; wetness or humidity; noise or vibration; fumes, odors, dusts, gases, and poor ventilation; and hazards. (*Id.*).

The ALJ found Dr. Garlow's opinion unpersuasive.[2] (ECF No. 12-2, pp. 26-27). The record does not contain additional physical consultative examinations or medical source statements, despite Plaintiff's specific request that the ALJ order consultative examinations as there had been no development of examining source opinion evidence. (ECF No. 12-6, p. 100). Without the opinion of Plaintiff's treating orthopedic surgeon, the ALJ could rely only on his own inferences about the more recent medical evidence showing Plaintiff's worsening condition because the non-examining state agency physicians did not have the opportunity to review those records.

In June 2019, Plaintiff followed up with Patrick Walton, PA-C, for right knee pain caused by a medial femoral condyle osteochondral lesion with arthritis in other areas. (ECF No. 12-10, p. 5). Plaintiff reported continued pain despite wearing her unloader brace for approximately one week and taking 600 mgs of ibuprofen twice a day. Walton noted that Plaintiff's options were limited as far as the NSAIDs she could take due to gastrointestinal issues. He also stated that Plaintiff's insurance made her ineligible for viscosupplementation[3] and steroids increased her blood sugars to about 350. Walton concluded that he was really limited in the conservative management options he could offer Plaintiff and scheduled her for a discussion with the surgeon regarding possible high tibial osteotomy, knee replacement, or other modalities. (*Id.*).

Imaging results of Plaintiff's right knee revealed weightbearing surface irregularity off the medial condyle and contra lateral side, subchondral sclerosis, relative narrowing of medial joint space, early peaking of tibial spines, a large spur in the patellofemoral joint, and spurring

---

[2] This report and recommendation does not review the ALJ's decision to discredit the opinion of the treating physician.
[3] Viscosupplementation is a treatment involving injection of hyaluronic acid into an arthritic joint, most commonly the knee, to reduce pain and swelling. *See Viscosupplementation Treatment for Arthritis*, at https://www.hopkinsmedicine.org/health/conditions-and-diseases/arthritis/viscosupplementation-treatment-for-arthritis (last accessed July 7, 2022).

9

underneath the inferior and superior poles of the patella. (ECF No. 12-10, p. 7, 43). Dr. Garlow's examination of Plaintiff's knee showed full motion overall without instability but definite irritability. (ECF No. 12-10, p. 7). He assessed that Plaintiff, despite her young age, exhibited underlying degeneration of her right knee, which had caused difficulty and evaded conservative measures. Dr. Garlow noted that injections, anti-inflammatories, anticonvulsants, nerve pain medications, and braces had failed. He hesitated to proceed with a large surgery or even an arthroplasty given Plaintiff's young age for these underlying grade four changes. (*Id.*).

Two months later, in August 2019, Plaintiff returned for treatment of severe right knee pain (ECF No. 12-10, p. 10) and distress due to pain in her lower back (ECF No. 12-9, p. 62). Dr. Garlow noted that Plaintiff had grade four lesions on her patella and condyle. He reiterated that Plaintiff's right knee pain evaded performance of a microfracture, administration of injections, prescriptions for several pain medications, fitting for braces, and application of CBD oil. While Dr. Garlow observed that Plaintiff's tibial alignment was relatively neutral, he considered the possibility of an arthroplasty, weighing Plaintiff's years of moderate to severe pain against the fact that she would be very young for such a procedure. Following a lengthy discussion about the risks, benefits, and alternatives, Dr. Garlow and Plaintiff ultimately decided to go forward with a right total knee arthroplasty. (*Id.*).

While waiting for surgery, Plaintiff continued to seek treatment from Christopher K. Mocek, M.D., for lower back pain. (ECF No. 12-9, p. 57, 53). Dr. Mocek assessed Plaintiff with radiculopathy of the lumbar region. While Plaintiff demonstrated a normal gait, Dr. Mocek prescribed pain medications for moderate to severe lower back pain. (*Id.*). He reviewed Plaintiff's MRI and x-rays revealing bone spurs, arthritis in the spine, degenerative changes, and bulging discs. (ECF No. 12-9, p. 55). Considering Plaintiff's body habitus, Dr. Mocek assessed that

Plaintiff was not eligible for procedures that required sedation. He suggested a medial branch nerve block as well as narcotic pain medications for Plaintiff's low back. (*Id.*).

Dr. Garlow performed the surgery without complications on October 15, 2019, and Plaintiff was discharged following an unremarkable hospital stay on October 17, 2019. (ECF No. 12-10, p. 14-17). Plaintiff reported improvement during follow-ups in November, and Dr. Garlow noted appropriate imaging results and examinations thus far. (*Id.* at 26-28, 47).

In December 2019, Dr. Mocek continued to treat Plaintiff's low back pain, noting Plaintiff's distress and paresthesia of the skin. (ECF No. 12-9, pp. 28, 33). The following month, Dr. Mocek assessed Plaintiff with radiculopathy of the lumbar region, pain in the right leg and low back, as well as intervertebral disc degeneration of the lumbar region. (*Id.* at 14).

Dr. Garlow continued to follow-up on the results of Plaintiff's total right knee arthroscopy in January 2020. (ECF No. 12-10, p. 29). He reviewed x-rays that showed well positioned knee components with appropriate sizing and no complications. (ECF No. 12-10, p. 49). However, Plaintiff reported swelling in the legs with half-dollar sized painful areas. (ECF No. 12-10, p. 29). Dr. Garlow ruled out deep vein thrombosis and prescribed methylprednisolone[4] with other topical nonsteroidal anti-inflammatory drugs. Dr. Garlow also initiated physical therapy aftercare for joint replacement surgery. (*Id.*). Plaintiff completed the six-week course in February 2020. (ECF No. 12-9, pp. 79-118).

While attending physical therapy three times weekly, Plaintiff also continued treatment for low back pain with Dr. Mocek. (ECF No. 12-9, pp. 14, 19). Plaintiff demonstrated a slow gait on examination, and Dr. Mocek refilled her pain medication prescriptions. (*Id.* at 19). However, in February 2020, Plaintiff reported that the medication was no longer effective. (*Id.* at 9). Dr.

---

[4] Methylprednisolone is used to treat inflammation. *See Methylprednisolone*, at https://medlineplus.gov/druginfo/meds/a682795.html (last accessed July 7, 2022).

Garlow noted that Plaintiff was five days short on her pill count and appeared distressed due to the pain. While she demonstrated a normal gait, Plaintiff's medications were adjusted, and she was instructed to return in four weeks for re-evaluation. (*Id.* at 12).

In March 2020, Plaintiff reported right leg pain, continued low back pain, and cutaneous lupus. (ECF No. 12-9, pp. 4, 38). Dr. Mocek again noted Plaintiff's distress due to pain, and a physical examination revealed a positive straight leg raise test on the right. Plaintiff was scheduled for a lumbar epidural steroid injection. (*Id.* at 4).

While the ALJ considered the consultative examinations predicting Plaintiff's RFC through August 16, 2019, there are no medical opinions, apart from Dr. Garlow's, assessing Plaintiff's RFC following the deterioration of her condition resulting in major surgery in October 2019. Medical evidence demonstrates continued treatment from June 2019 to March 2020, including an operative report for a total right knee arthroplasty. (ECF No. 12-9, pp. 4, 14, 19, 28, 33, 38, 53, 57; ECF No. 12-10, pp. 5, 7, 10, 29, 43). The medical evidence recounted here was not reviewed by the non-examining state agency physicians in support of their assessments of Plaintiff's ability to function in the workplace, and the ALJ disregarded Dr. Garlow's assessment of the same. Notably, Dr. Garlow's opinion was based on his interpretation of these more recent medical records, including his own treatment notes and operative report for Plaintiff's right knee surgery. Because the ALJ disregarded Dr. Garlow's assessment and no other medical opinions assessed Plaintiff's capacity to work during the period outside of the state agency physicians' scope of review, including a total right knee arthroplasty and other worsening conditions, the ALJ could only rely on his own inferences as to Plaintiff's limitations in a work setting.

To support his RFC finding, the ALJ pointed to treatment notes following surgery in which providers noted improved knee pain, well-positioned knee components, normal gait, and a negative

deep vein thrombosis scan. (ECF No. 12-2, pp. 22-27). However, because the RFC is a medical question, the ALJ was not permitted to rely on his own interpretation of these treatment notes to arrive at Plaintiff's RFC. Our review of the record reveals that the record is incomplete as it does not contain enough evidence to determine the impact of Plaintiff's impairments on her ability to work, especially when the ALJ disregarded Plaintiff's orthopedic surgeon's opinion and declined to order any consultative examinations despite treatment records showing a worsening condition during the period outside of the consulting physicians' scope of review.

Accordingly, we cannot say the ALJ's decision is supported by substantial evidence, and the case must be reversed and remanded. On remand, the ALJ should be directed to obtain RFC assessments from the Plaintiff's treating physicians, allowing the treating physicians the opportunity to provide an explanation for the limitations assigned should the ALJ have questions. If those physicians are unwilling or otherwise unable to complete the RFC assessments, then the ALJ should be directed to order a consultative examination, complete with a detailed RFC assessment of the Plaintiff's limitations. The ALJ should then reassess the Plaintiff's RFC, considering all her impairments, and conduct a thorough step four and, if necessary, step five analysis.

## IV.   Conclusion

Based on the foregoing analysis, it is recommended this case be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties**

**that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 8th day of July 2022.

/s/ Mark E. Ford<br>
HONORABLE MARK E. FORD<br>
UNITED STATES MAGISTRATE JUDGE